# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 21-32V
Filed: August 19, 2024

| | |
|---|---|
| BRUCE ROBINSON,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Special Master Horner |

*David John Carney*, Green & Schafle, LLC, Philadelphia, PA, for petitioner.
*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION[1]

On January 4, 2021, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10, *et seq.* (2012),[2] alleging that he a left shoulder injury resulting from his January 23, 2019 tetanus vaccination. (ECF No. 1.) For the reasons discussed below, I now find that petitioner is *not* entitled to compensation.

### I.  Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines. In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute;

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

1

received it in the United States; suffered a serious, long-standing injury; and has received no previous award or settlement on account of the injury. Finally – and the key question in most cases under the Program – the petitioner must also establish a causal link between the vaccination and the injury. § 300aa-11(c).

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury." That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table. If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination. § 300aa-13(a)(1)(A)-(B); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a).

The Vaccine Injury Table lists a Shoulder Injury Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within 48 hours of vaccine administration. § 300aa-14(a), *amended by* 42 CFR § 100.3. Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAIs"), which provide more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table. 42 CFR § 100.3(c). To be considered a "Table SIRVA," petitioner must show that his injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 CFR § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii).  To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury."  *Moberly ex rel. Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999)); *Pafford ex rel. Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006).  In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact.  *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).  A petitioner may also demonstrate that a vaccine caused a significant aggravation of a pre-existing condition.  *See Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (2009) (combining the first three *Whitecotton* factors for claims regarding aggravation of a Table injury with the three *Althen* factors for off table injury claims to create a six-part test for off-Table aggravation claims); *see also W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (applying the six-part *Loving* test.).

For both Table and Non–Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence".  § 300aa-13(a)(1)(A).  That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence . . . ."  *Moberly*, 592 F.3d at 1322 n.2.  Proof of medical certainty is not required.  *Bunting ex rel. Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991).  However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  § 300aa-13(a)(1).  Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination.  *Althen,* 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

## II.     Procedural History

Based on the allegations in the petition, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU").  (ECF No. 9-10.)  Petitioner filed an affidavit and medical records marked as Exhibits P1-P10.  (ECF Nos. 6, 17.)  In November of 2022, respondent filed his Rule 4 Report recommending against compensation.  (ECF No. 26.)  Respondent argued that petitioner's injury was inconsistent with a Table SIRVA and further that he had demonstrated neither causation-in-fact or any significant aggravation of his condition.  (*Id*. at 15-23.)  Thereafter, the case was reassigned to the undersigned.  (ECF Nos. 27-28.)

Petitioner then filed an expert report by physical medicine and rehabilitation specialist Naveed Natanzi, D.O., with supporting materials.  (ECF Nos. 29-31; Exs. P11-P13.)  Respondent responded with a report by orthopedic surgeon Geoffrey Abrams, M.D., accompanied by supporting materials.  (ECF Nos. 33, 40; Exs. A-B.)  Petitioner subsequently filed a supplemental report by Dr. Natanzi.  (ECF No. 34; Ex. P14.)  I then directed the parties to propose a briefing schedule for a ruling on the written record (or to otherwise object to proceeding in that manner).  Petitioner filed a motion for a ruling on the written record on September 27, 2023.  (ECF No. 37.)  Respondent filed his response on December 5, 2023, and petitioner filed a reply on December 19, 2023.  (ECF Nos. 39, 41.)

In light of the above I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve this issue without a hearing.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *see also Kreizenbeck ex rel. C.J.K v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, this matter is now ripe for resolution.

### III.     Factual History

Prior to the vaccination at issue, petitioner had a ten-year history of left shoulder problems.  In January of 2011, he underwent a left shoulder arthroscopy with labral debridement, subacromial decompression, and rotator cuff repair.  (Ex. 9, p. 50.)  On October 1, 2018, he underwent a complete left shoulder replacement and bicep tenodesis.  (Ex. P7, p. 109.)  Petitioner argues that the October 2018 surgery had no complications and that he had "no issues" following the surgery.  (ECF No. 37, p. 3.)

As of a December 20, 2018, follow up, petitioner was noted to be doing "much better," though his orthopedist, Dr. Williams of Rothman Orthopedics, felt he continued to have some reduced range of motion.  (Ex. P1, p. 38.)  X-rays showed his shoulder implant to be in good condition and petitioner estimated he had 70% of his normal function, with pain ranging from 0 at rest to a maximum of 3.  (*Id*.)  Petitioner was assessed with recurrent dislocation, primary osteoarthritis, and bicipital tendinitis of the left shoulder.  (*Id*.)  Petitioner wanted to resume playing golf and the orthopedist agreed he could try, noting that it usually takes about three months to resume such activity post-surgery.  (*Id*.)

On January 23, 2019, petitioner received the tetanus vaccination at issue.  (Ex. P1, p. 33.)  He avers in his written statement that he was pain free at the time of the vaccination, but that he

> felt pain and soreness at the injection site in my left shoulder.  As the day progressed the pain worsened and over the following two days, the pain increased in intensity to the point where I began to think I was not

> experiencing routine vaccination discomfort. Throughout the following two weeks, the soreness increased.

(Ex. P2, ¶¶ 9-10.) Petitioner further indicates that "while completing my physical therapy from my previous operation, my strength decreased drastically and immediately." (*Id*. at ¶ 10.) However, I cannot locate any confirmation within petitioner's physical therapy records that he was continuing physical therapy for his shoulder during this period. (*See* Ex. P8.)

Petitioner returned to Rothman Orthopedics on January 29, 2019, presenting to Dr. Ross with a new complaint of right hamstring pain that had begun about six months prior. (Ex. P1, p. 35.) Petitioner did not report any shoulder pain. (*Id.*) The physical examination recorded that "Neck, back, and bilateral upper and lower extremities all move well with normal range of motion, normal strength, no asymmetry, atrophy, deformity, tenderness or instability." (*Id.*) Petitioner then had a physical therapy appointment for his hamstring the next day with no mention of shoulder pain. (Ex. P8, pp. 66-68.)

Petitioner avers that he called Dr. Williams to report his post-vaccination shoulder pain on February 8, 2019, and was told to wait a further week to see if the pain persisted. (Ex. P2, ¶ 11.) The Rothman Orthopedics records confirm the call, but do not corroborate petitioner's account of his shoulder pain. (Ex. P10, p. 57.) Although the record confirms that petitioner associated his shoulder pain with his tetanus vaccination, it specifies that he reported that the pain had begun five days prior and that it had been intermittent. (*Id.*)

Petitioner had a follow up appointment with Dr. Williams on February 19, 2019. (Ex. P1, p. 32.) The history of present illness indicates that "[h]e was doing great. He was actually full speed ahead. He was wonderfully happy with his shoulder until about two or three weeks ago. He spontaneously began to experience more pain and he also noted weakness along with decreased range of motion." (*Id.*) Dr. Williams remarked on physical exam "the thing that bothers me is that he definitely has weakness in external rotation." (*Id.*) In further notes, he explained that "[t]his really was not brought on by an injury. It sounds like it was spontaneous rupture of his rotator cuff and I am concerned that that is what happened . . . Given his degree of weakness, I suspect that it may be a relatively large tear." (*Id.*)

A follow up ultrasound confirmed a full-thickness tear of the left infraspinatus tendon. (Ex. P3, pp. 54-55.) In his motion, petitioner confirms this represented a new tear. (ECF No. 37, pp. 4-5 (citing Ex. P4, p. 4-14 and noting the tear had not been documented prior to the October 2018 surgery).) After reviewing the ultrasound, Dr. Williams further explained:

> That is a very unusual tear pattern especially after shoulder replacement, but even in general. Most of the time, an infraspinatus gets torn in an isolated fashion, it is associated with some form of traumatic event. It is

5

> hard for me to understand how it could be associated with a tetanus shot. It seems unlikely to me that the needle could have been put into the infraspinatus and had an injection. It was not severely painful. However, the bottom line is it looks like he has a tear of the infraspinatus . . .

(Ex. P3, p. 28.)[3]  Dr. Williams recommended an arthroscopic procedure to confirm the injury is limited to the infraspinatus and to potentially suture it. (*Id*. at 29.) He further explained that

> I also checked his motion today and passively I can get him up to 160 degrees very easily. Therefore, his shoulder is not stiff, just weak. With any luck, this is an acute event, we can get the infraspinatus back where it came from, fix it and have it healed.

(*Id*.)

On March 6, 2019, petitioner underwent an arthroscopic rotator cuff repair. (Ex. P3, pp. 77-78.) Dr. Williams confirmed that petitioner had full range of motion and that the subscapularis and supraspinatus were both healed, but that the infraspinatus was torn off the humerus. (*Id*. at 77.) During a follow up appointment on March 19, 2019, Dr. Williams felt that the procedure was successful in fixing the infraspinatus and he stated, "I am hoping that if this heals, he will wind up getting a better shoulder." (Ex. P1, p. 30.) However, petitioner was not ultimately satisfied with the progress of his recovery. (ECF No. 37, p. 5 (citing Ex. P5, p. 29; Ex. P2, ¶ 14); *see also* Ex. P3, p. 22 (report pain levels of 5 out of 10 and April 8, 2019 post-surgical follow up).) Nonetheless, as of May 21, 2019, Dr. Williams was optimistic that the rotator cuff repair had been helpful. (Ex. P1, p. 28.)

On July 23, 2019, petitioner had a further post-surgical follow up with Dr. Williams. (Ex. P3, p. 18.) Petitioner complained of some pain, but primarily a lack of function in his shoulder. (*Id*.) Dr. Williams continued to believe that his symptoms were stemming from rotator cuff insufficiency but indicated that his pain and level of function suggested that a revision of his prior shoulder replacement to a reverse shoulder replacement would be appropriate. (*Id*. at 19.) At a further follow up on September 17, 2019, Dr. Williams maintained his recommendation. (*Id*. at 16-17.)

Shortly thereafter, petitioner sought a second opinion from orthopedist Lawrence Miller, M.D., regarding the proposed reverse shoulder revision. (Ex. P6, p. 10.) Petitioner reported that he had been doing well after his October 2018 shoulder surgery until he received a vaccination (incorrectly noted as a flu shot) in that shoulder "which caused him a lot of pain and weakness in the arm." (*Id*.) He specified that he had no fall or trauma when the pain began. (*Id*.) Dr. Miller reviewed petitioner's prior reports from Rothman Orthopedics but did not have imaging available. (*Id*. at 11-12.) Dr. Miller

---

[3] Contrary to Dr. Williams's opinion that a vaccination needle would not come into contact with the infraspinatus tendon, petitioner later reported to his physical therapist that the tetanus vaccination had caused his rotator cuff tear. (Ex. P8, p. 61.)

opined that "[i]t is not clear why the shoulder failed," but agreed that the reverse shoulder replacement was the only option.  (*Id*. at 12.)

Petitioner had a shoulder revision surgery on October 7, 2019.  (Ex. P7, p. 7.)  Petitioner continued to seek further treatment as he recovered from this surgery; however, the remainder of his medical records are not informative with respect to the underlying cause of his condition.

## IV.   Expert Reports

### a.   Naveed Natanzi, D.O.[4]

Dr. Natanzi opines that petitioner's injury was due to overpenetration of his vaccination needle into his rotator cuff, resulting in a SIRVA.  (Ex. P11, p. 8-10.)  This opinion is based on three factors (1) accepting petitioner's account of a post-vaccination onset; (2) the lack of any other injury during the period of onset; and (3) the available objective findings.  (*Id*.)  Dr. Natanzi stresses that he believes petitioner's rotator cuff was likely intact following his October 2018 surgery.  (*Id*. at 8-9.)  Dr. Natanzi acknowledges petitioner had an isolated infraspinatus tendon tear but opines that such tears are well documented in the SIRVA literature.  (*Id*. at 9 (citing S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA),* 28 VACCINE 8049 (2010) (Ex. P13, Tab b); Matthew G. Barnes et al., *A "Needling" Problem: Shoulder Injury Related to Vaccine Administration,* 25 J. AM. BD. FAM. MED. 919 (2012) (Ex. P13, Tab c); Soshi Uchida et al., *Subacromial Bursitis Following Human Papilloma Virus Vaccine Misinjection,* 31 VACCINE 27 (2012) (Ex. P13, Tab l); Maj Sofia Szari et al., *Shoulder Injury Related to Vaccine Administration: A Rare Reaction,* 36 FED. PRAC. 380 (2019) (Ex. P13, Tab o); Michael Shahbaz et al., *Shoulder Injury Related to Vaccine Administration (SIRVA): An Occupational Case Report,* 67 WORKPLACE HEALTH & SAFETY 501 (2019) (Ex. P13, Tab p); 42 CFR § 100.3(c)(10)).)

In response to Dr. Abrams, Dr. Natanzi acknowledges that post-shoulder replacement rotator cuff tearing is "an unfortunate but known phenomenon," though he asserts it is rarer than Dr. Abrams suggests and typically is not acute absent trauma.  (Ex. 14, p. 2.)  Dr. Natanzi also suggests that the literature Dr. Abrams cites would not account for this happening as soon as four and a half months following the surgery.  (*Id*.)  Dr. Natanzi acknowledges that rotator cuff tears can result from post-surgical

---

[4] Dr. Naveed Mayer Natanzi received his bachelor's degree from the University of California, Santa Barbara and his Doctor of Osteopathy from Western University of Health Sciences.  (Ex. P12, p. 2.)  He completed an internship at Downey Regional Medical Center and a residency in physical medicine and rehabilitation at the University of California, Irvine.  (*Id*. at 1-2.)  He also completed a fellowship at Bodor Clinic in Interventional Regenerative Sports and Spine Medicine.  (*Id*. at 1.)  He is board certified in both physical medicine and rehabilitation, and pain management.  (*Id*.)  He founded the Interventional Regenerative Sports and Spine Medicine branch of Regenerative Sports and Spine Institute and currently works as a staff physician at VA Long Beach Healthcare System and a medical director at Tova Surgical Center.  (*Id*.)  He has authored eight publications.  (*Id*. at 3.)

physiotherapy but believes this is "almost always" associated with a traumatic and painful event." (*Id*. at 3.)  Dr. Natanzi asserts that

> [a]lthough the findings of a full-thickness cuff tear (as opposed to a partial tear) are uncommon in the setting of a SIRVA injury, the fact that Mr. Robinson had an intact cuff coming out of surgery and the acuity of pain that he presented with after vaccination just a few months after surgery makes the vaccine the only reasonable culprit.

(*Id*. at 2.)  Although Dr. Natanzi stresses that petitioner's rotator cuff was likely intact following his surgery, he does agree that his prior history likely left his infraspinatus tendon "relatively weaker" and susceptible to a full thickness tear from the vaccination. (*Id*.)

### b.  Geoffrey Abrams, M.D.[5]

Dr. Abrams opines that petitioner's condition can be explained by rotator cuff tearing alone.  (Ex. A, p. 6.)  Given that petitioner's medical records confirm his infraspinatus tear as the cause of his symptoms, the key question is what caused the tear.  (*Id*.)  In that regard, he indicates rotator cuff tears are a well-known post-surgical phenomenon.  (*Id*. (citing Alvarho Guzman et al., *Arthroscopic Repair of Traumatic Rotator Cuff Tear Following Total Shoulder Arthroplasty: A Case Report and Review of Literature,* 11 CLINICAL CASE REPS. e07210 (2023) (Ex. A, Tab 1); Steven J. Hattrup et al., *Rotator Cuff Repair After Shoulder Replacement,* 15 J. SHOULDER & ELBOW SURGERY 78 (2006) (Ex. A, Tab 2); David M. Levy et al., *Rotator Cuff Tears After Total Shoulder Arthroplasty in Primary Osteoarthritis: A Systematic Review,* 10 INT'L J. SHOULDER SURGERY 78 (2016) (Ex. A, Tab 3); Allan A. Young et al., *Secondary Rotator Cuff Dysfunction Following Total Shoulder Arthroplasty for Primary Glenohumeral Osteoarthritis: Results of a Multicenter Study with More than Five Years of Follow-Up,* 94 J. BONE & JOINT SURGERY 685 (2012) (Ex. A, Tab 4); Filippo Familiari et al., *Supraspinatus Tears After Total Shoulder Arthroplasty: A Review of Diagnosis and Treatment,* 25 SEMINARS ARTHROPLASTY 64 (2014) (Ex. A, Tab 5)).)  Further, Dr. Abrams indicates that petitioner's MRI prior to his first surgery in 2011 confirmed that he was suffering severe atrophy of his infraspinatus muscle, likely due to tendon tearing.  (*Id*. (citing Ex. P9, p. 46).)  A slow worsening and increase in tearing over time is the known, natural history of rotator cuff pathology.  (*Id*.)  Petitioner's age and repeated treatment with corticosteroid injections are further factors that can contribute to rotator cuff deterioration.  (*Id*. at 6-7 (citing Ken Yamaguchi et al., *The Demographic and*

---

[5] Dr. Geoffrey D. Abrams received his bachelor's degree from Stanford University and his medical degree from the University of California, San Diego.  (Ex. B, pp. 1-2.)  He completed a surgical internship at the Department of General Surgery and a residency in the Department of Orthopedic Surgery at Stanford University Hospital and Clinics.  (*Id*. at 1.)  Additionally, he completed a fellowship in orthopedic sports medicine at Rush University Medical Center.  (*Id.*)  He is board certified in orthopedic surgery.  (*Id*. at 2.)  He currently works as an associate professor at Stanford University School of Medicine and as the Director of Sports Medicine for Varsity Athletics Lacob Family Sports Center at Stanford University.  (*Id.* at 1.)  He has authored 140 peer reviewed publications, four peer reviewed short communications, 37 book chapters, and 97 peer reviewed abstracts.  (*Id.* at 2-18, 20-30.)

*Morphological Features of Rotator Cuff Disease: A Comparison of Asymptomatic and Symptomatic Shoulders,* 88 J. BONE & JOINT SURGERY 1699 (2006) (Ex. A, Tab 6); Benjamin John Floyd Dean, et al., *Glucocorticoids Induce Specific Ion-Channel-Mediated Toxicity in Human Rotator Cuff Tendon: A Mechanism Underpinning the Ultimately Deleterious Effect of Steroid Injection Tendinopathy?,* 48 BRIT. J. SPORTS MED. 1620 (2014) (Ex. A, Tab 7)).)  Although petitioner's August 2018 MRI confirmed his rotator cuff tendons were intact, it did not otherwise indicate the condition of the tendons.  (*Id*. at 7.)  Alternatively, with or without the tear being a pain generator, petitioner's presentation is also potentially consistent with his October 2018 surgery simply having been less successful than initially thought.  (*Id.* at 8.)  Dr. Abrams notes that his increased symptoms occurred about three to four months post-surgery, which corresponds to the strengthening phase of rehabilitation.  (*Id.*)  It is common for symptoms to increase during this phase of rehabilitation.  (*Id.*)  In either event, Dr. Abrams also disputes Dr. Natanzi's contention that rotator cuff tendon tears are common in SIRVA.  (*Id.*)  Although Dr. Abrams agrees that many SIRVA patients have pre-existing partial rotator cuff pathology at the time of their SIRVAs, "full thickness tears – essentially acute ruptures of a rotator cuff tendon as is suspected in the petitioner – is not a known or reported complication of SIRVA and also does not agree with the accepted mechanism of SIRVA . . ."  (*Id.*)  Moreover, Dr. Abrams disagrees that the timing of onset is appropriate to invoke SIRVA.  (*Id*. at 8-9.)

## V.     Analysis

### a. Onset of petitioner's shoulder pain is incompatible with either a Table SIRVA or any SIRVA-like injury caused-in-fact by vaccination

In his motion petitioner confirms that, whether approaching the case as a Table Injury of SIRVA or as a shoulder injury caused (or aggravated) in fact by vaccination, his claim is premised on a finding that the onset of his shoulder pain began within 48 hours of his vaccination.  (ECF No. 37, pp. 14-17, 32-33; ECF No. 41, pp. 2-3, 11-12.)  Moreover, based on my review of Dr. Natanzi's reports, he bases his opinion on an assumption that onset of petitioner's shoulder pain began within 48 hours of vaccination and does not set forth any other medically appropriate timeframe from which to infer vaccine causation.  (Ex. P11, p. 8, Ex. P14, p. 1.)  Nor, even undertaking independent review of the medical literature filed, would I conclude that such a showing has been made.  *E.g. Pitts v. Sec'y of Health & Human Servs.*, No. 18-1512V, 2023 WL 2770943, at *14 (Fed. Cl. Spec. Mstr. Mar. 10, 2023) (finding a one-week post-vaccination onset is not supported by SIRVA medical literature and collecting cases with respect to timing of onset for SIRVA-like injuries).  Accordingly, petitioner's failure to preponderantly demonstrate this timing of onset is dispositive.

Pursuant to Vaccine Act § 300aa-13(a)(1)(A), a petitioner must prove their claim by a preponderance of the evidence.  A special master must consider the record as a whole, but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record.  § 300aa-13(b)(1).  However, the Federal Circuit has held that contemporaneous medical records are ordinarily to be given

significant weight due to the fact that "[t]he records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.  These records are also generally contemporaneous to the medical events." *Cucuras ex rel. Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Thus, where medical records are clear, consistent, and complete, they should be afforded substantial weight.  *Lowrie ex rel. Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule is not absolute.  *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1382 (Fed. Cir. 2021) (stating that "[w]e reject as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions.")  Afterall, "medical records are only as accurate as the person providing the information." *Parcells ex rel. Parcells v. Sec'y of Health & Human Servs.*, No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006).  In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent."  2005 WL 6117475, at *19 (quoting *Murphy ex rel. Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992)).  Importantly, however, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy*, 23 Cl. Ct. at 733 (quoting the decision below), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992).

When witness testimony is offered to overcome the weight afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein ex rel. Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  Further, the Special Master must consider the credibility of the individual offering the testimony. *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).  In determining whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony, there must be evidence that this decision was the result of a rational determination.  *Burns ex rel. Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 416-17 (Fed. Cir. 1993).  The special master is obligated to consider and compare the medical records, testimony, and all other "relevant and reliable evidence" contained in the record.  *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 300aa-12(d)(3); Vaccine Rule 8), *aff'd sub nom. LaLonde ex rel. L.M. v. Sec'y of Health & Human Servs.*, 746 F.3d 1334 (Fed. Cir. 2014); *see also Burns*, 3 F.3d at 416.

As explained above, petitioner's affidavit confirms that he first reported his new shoulder pain to Dr. Williams by phone on February 8, 2019.  (Ex. P2, ¶ 11.)  However, the contemporaneous record of that call documents that petitioner's call resulted in a voicemail in which he stated that "he noticed the pain about 5 days ago," which unambiguously places onset on or about February 3, 2019, approximately two weeks

after his tetanus vaccination.  (Ex. P10, p. 57.)  Although the record documents a subsequent conversation discussing that petitioner suspected that his pain was related to the vaccination, that additional notation does not contradict the timing of onset indicated by the voicemail.  (*Id*.)  When petitioner followed up with Dr. Williams in person about ten days later, he reported as of February 19, 2019, that the condition had been present for "two or three weeks."  (*Id*. at 54.)  This places onset between about January 29, 2019, and February 5, 2019, broadly consistent with the onset reported in the prior voicemail.  Nothing on this record suggests any reason to doubt the accuracy of these initial, contemporaneous treatment records.  Thus, they should be afforded substantial weight.  Dr. Natanzi reasons on petitioner's behalf that these encounter records are explained by the fact that SIRVA patients often do not initially associate their symptoms to their vaccinations.  (Ex. P11, p. 8.)  However, this rationale cannot explain the medical records in this case.  The records confirm that petitioner reported onset occurring about two weeks post-vaccination while also explicitly suspecting the symptoms were vaccine-related.  (Ex. P10, p. 57.)  When petitioner subsequently sought a second opinion, he again repeated that his felt his symptoms were vaccine-caused, but the record does not address the timing of onset.  (Ex. P6, p. 10.)

      I have also considered petitioner's competing narrative account.  However, I do not find that it outweighs the contemporaneous records for several reasons.  First, petitioner's statement was not signed until January 27, 2021.  (Ex. P2, p. 5.)  By contrast, his first report of increased shoulder pain occurred a mere five days after onset.  (Ex. P10, p. 57.)  Thus, it reflects a much fresher recollection.  Second, petitioner's statement associates the onset of his shoulder pain to a drastic decrease in ability to complete his physical therapy; however, there do not appear to be any physical therapy records available to corroborate that assertion.  Third and relatedly, petitioner's recollection that onset of his shoulder pain and weakness occurred shortly after vaccination is explicitly contradicted by physical examination findings from January 29, 2019.  (Ex. P1, p. 35.)  As of that date, Dr. Ross documented normal strength, normal range of motion, and a lack of any tenderness or instability in petitioner's bilateral upper extremities.  (*Id*.)  Dr. Natanzi stresses that it would be common for a shoulder complaint to go unmentioned at an appointment focused on petitioner's hamstring injury.  (Ex. P11, p. 8.)  If the medical record were limited to simply failing to record a history of shoulder pain or failing to document any upper extremity exam, I might agree.  *Cf. Kirby*, 997 F.3d at 1383 (observing that a physical exam noting only "neurological: not present – dizziness" does not confirm a complete absence of neurologic symptoms).  However, this reasoning cannot explain Dr. Ross's explicit notation describing a normal upper extremity exam.  (Ex. P1, p. 35.)  This is especially concerning because, although the appointment was for a hamstring complaint, Dr. Ross is an orthopedist who would otherwise be more likely to record an accurate musculoskeletal exam.  Moreover, Dr. Ross's record is consistent with the other contemporaneous medical records which place onset of shoulder pain by petitioner's own report around January 29, 2019 *at the earliest*.

Considering all of the above, and based on the record as a whole, the evidence preponderates in favor of a finding that petitioner's shoulder pain began after January 29, 2019, *at the earliest*.

### b. The evidence preponderates in favor of a finding that petitioner suffered a tear of his infraspinatus tendon unrelated to his vaccination

Regardless of whether petitioner was to meet the four QAI criteria of a Table SIRVA or otherwise present a *prima facie* case based on causation-in-fact, respondent would still be permitted to demonstrate that petitioner's condition is otherwise explained by a factor unrelated to vaccination.  § 300aa-13(a)(1)(B).  In that regard, respondent argues (in the Table context), based on Dr. Abrams's assessment, that petitioner's increased shoulder pain is likely explained by shoulder pathology unrelated to vaccination.  (ECF No. 39, pp. 16-17.)  Consistent with respondent's argument, my conclusion is that the evidence preponderates in favor of petitioner's shoulder symptoms being caused by an infraspinatus tear unrelated to vaccination.

First and foremost, spontaneous rupture of the rotator cuff, rather than any vaccine-related rotator cuff injury, was Dr. Williams's initial impression.  (Ex. P1, p. 32.)  That conclusion was later confirmed by ultrasound and during an arthroscopic procedure.  (Ex. P3, pp. 54-55, 77-78.)  Further, Dr. Williams considered petitioner's report that he was suspicious that his symptoms were related to his vaccination but concluded that vaccine-causation was unlikely.  (*Id.* at 28.)  Petitioner later reported his symptoms to a second orthopedist, Dr. Miller, as a post-vaccination occurrence, but did not receive any different assessment.  (Ex. P6.)  Although not binding, treating physician opinions are "favored" because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury."  *Capizzano v. Sec'y of Health & Human Servs*., 440 F.3d 1317, 1326 (Fed. Cir. 2006) (citations omitted).

Dr. Williams's assessment is particularly compelling in this case for several reasons.  First, both experts agree with Dr. Williams's diagnosis of an infraspinatus tear as the likely source of petitioner's symptoms.  (Ex. 11, p. 9; Ex. A, p. 6.)  Second, Dr. Williams was the first physician to whom petitioner reported his symptoms and he was already very familiar with petitioner's prior condition, having been petitioner's surgeon for his October 2018 surgery and the physician attending to his post-surgical follow up.  (Ex. P10, p. 57; Ex. P7, p. 109; Ex. P1, pp. 35, 38.)  Moreover, Dr. Williams himself visualized the injury as limited to the infraspinatus during his arthroscopic follow up procedure.  *See Nuttall v. Sec'y of Health & Human Servs*., 122 Fed. Cl. 821, 832 (2015) (explaining that treating physician opinion is favored because they generally are familiar with the patient before and after the injury and are witness to the condition unfolding).  Third, Dr. Williams is an orthopedic specialist.  And, fourth, his records reflect that in opining against vaccine causation, Dr. Williams specifically contemplated

the causal theory (needle overpenetration into the cuff) raised by Dr. Natanzi.  (*See* Ex. P3, p. 28.)

Additionally, Dr. Natanzi's assessment that SIRVA is more likely is based on an assumption regarding onset that is not preponderantly supported for the reasons discussed in the preceding section.  Accordingly, his ultimate conclusion as to vaccine causation is not persuasive.  *See Burns,* 3 F.3d at 417 (holding that "[t]he special master concluded that the expert based his opinion on facts not substantiated by the record.  As a result, the special master properly rejected the testimony of petitioner's medical expert."); *Rickett v. Sec'y of Health & Human Servs.,* 468 F. App'x 952, 958 (Fed. Cir. 2011) (holding that "it was not error for the Special Master to assign less weight to Dr. Bellanti's conclusion regarding challenge-rechallenge to the extent it hinged upon Mr. Rickett's testimony that was inconsistent with the medical records."); *Dobrydnev v. Sec'y of Health & Human Servs.,* 566 F. App'x 976, 982–83 (Fed. Cir. 2014) (holding that the special master was correct in noting that "when an expert assumes facts that are not supported by a preponderance of the evidence, a finder of fact may properly reject the expert's opinion") (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 242 (1993)); *see also Bushnell ex rel. J.R.B. v. Sec'y of Health & Human Servs.,* No. 02-1648V, 2015 WL 4099824, at *12 (Fed. Cl. Spec. Mstr. June 12, 2015) (finding that "because Dr. Marks' opinion is based on a false assumption regarding the onset of J.R.B.'s condition, and the incorrect assumption of a 'stepwise regression' after each vaccine administration, it should not be credited.")  Absent that false assumption regarding onset, Dr. Natanzi does not otherwise dispute that an infraspinatus tear can happen spontaneously as both Drs. Williams and Abrams opined.  In fact, he agrees that rotator cuff tears occurring post-surgery is a known phenomenon and that petitioner's prior history did leave him susceptible to such a tear.  (Ex. P14, p. 2.)

Finally, Dr. Natanzi is not persuasive in contending that needle overpenetration can cause a complete tear of the infraspinatus tendon as seen in petitioner.  (Ex. P11, pp. 8-11.)  Dr. Natanzi cites five references for the proposition that rotator cuff tendon tears can be seen in SIRVA; however, these citations do not support needle overpenetration as a cause of rotator cuff tearing.  (*Id.* at 9 (citing Atanasoff et al., *supra,* at Ex. P13, Tab b); Barnes et al., *supra,* at Ex. P13, Tab c; Uchida et al., *supra,* at Ex. P13, Tab l; Szari et al., *supra,* at Ex. P13, Tab o; Michael Shahbaz et al., *supra,* at Ex. P13, Tab p).)  On the whole, the sources cited by Dr. Natanzi support the proposition that needle penetration into the subacromial space can result in an inflammatory reaction that can lead to bursitis and shoulder dysfunction.  However, these sources do not establish that needle penetration into the rotator cuff occurs or can lead to a full thickness tear of the infraspinatus.  Instead, as Dr. Abrams alludes, the Atanasoff paper hypothesizes that inflammation of the shoulder capsule can lead to the activation of pre-existing, but previously asymptomatic, shoulder dysfunction.  (Atanasoff et al., *supra,* at Ex. 13, Tab b, pp. 2-3.)  Here, however, Dr. Natanzi stresses that his opinion is that petitioner's infraspinatus tear was *not* preexisting.  (Ex. P14, p. 2

13

("there is no reason to believe that [petitioner's] rotator cuff was not completely intact coming out of his surgier on 12/20/18.") Moreover, Dr. Williams confirmed during the subsequent arthroscopic tendon repair that the injury was limited to the infraspinatus. (Ex. P3, p. 77.) Presumably if a broader inflammatory process was unfolding in the shoulder capsule, it would have been observed at that time.

### VI. Conclusion

Petitioner has my sympathy for the injury he suffered. However, for all the reasons discussed above, I cannot conclude that he has preponderantly demonstrated his injury to constitute a Table Injury of SIRVA or that it was either vaccine caused or aggravated. Accordingly, this case is dismissed.[6]

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

---

[6] In the absence of a timely-filed motion for review of this Decision, the Clerk of the Court shall enter judgment accordingly.